Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

| For Prothonotary Use Only (Docket Number) |
|---|
| **JULY 2026** |
| E-Filing Number: 2607054957 |
| **02772** |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| ROBERT RANNEY | CORTEVA, INC. |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 26200 ROAD 204 EXETER CA 93221 | R/A - THE CORPORATION TRUST CO 1209 ORANGE STREET WILMINGTON DE 19801 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| JENNIFER RANNEY | CORTEVA AGRISCIENCE LLC |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 26200 ROAD 204 EXETER CA 93221 | R/A - THE CORPORATION TRUST CO 1209 ORANGE STREET WILMINGTON DE 19801 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | THE DOW CHEMICAL COMPANY |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | R/A - THE CORPORATION TRUST CO 1209 ORANGE STREET WILMINGTON DE 19801 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 2 | 4 | [X] Complaint  [ ] Petition Action  [ ] Notice of Appeal  [ ] Writ of Summons  [ ] Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS |
|---|---|
| [ ] $50,000.00 or less  [X] More than $50,000.00 | [ ] Arbitration  [ ] Mass Tort  [ ] Commerce  [ ] Settlement  [X] Jury  [ ] Savings Action  [ ] Minor Court Appeal  [ ] Minors  [ ] Non-Jury  [ ] Petition  [ ] Statutory Appeals  [ ] W/D/Survival  [ ] Other: _____ |

CASE TYPE AND CODE

2P - PRODUCT LIABILITY

STATUTORY BASIS FOR CAUSE OF ACTION

RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER)

**FILED PRO PROTHY**

JUL **23** 2026

**C. SMITH**

IS CASE SUBJECT TO COORDINATION ORDER?

YES          NO

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: ROBERT RANNEY , JENNIFER RANNEY

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| TAYJES MATTHEW. SHAH | 108 RAILROAD AVE ORANGE VA 22960 |

| PHONE NUMBER | FAX NUMBER | |
|---|---|---|
| (540)672-4224 | (540)672-3055 | |

| SUPREME COURT IDENTIFICATION NO. | E-MAIL ADDRESS |
|---|---|
| 307899 | tshah@millerfirmllc.com |

| SIGNATURE OF FILING ATTORNEY OR PARTY | DATE SUBMITTED |
|---|---|
| *TAYJES SHAH* | Thursday, July 23, 2026, 02:52 pm |

FINAL COPY (Approved by the Prothonotary Clerk)

**COMPLETE LIST OF DEFENDANTS:**

1. CORTEVA, INC.
    R/A - THE CORPORATION TRUST CO 1209 ORANGE STREET
    WILMINGTON DE 19801
2. CORTEVA AGRISCIENCE LLC
    R/A - THE CORPORATION TRUST CO 1209 ORANGE STREET
    WILMINGTON DE 19801
3. THE DOW CHEMICAL COMPANY
    R/A - THE CORPORATION TRUST CO 1209 ORANGE STREET
    WILMINGTON DE 19801
4. FMC  CORPORATION
    2929 WALNUT STREET
    PHILADELPHIA PA 19104

Tayjes Shah, Identification No. 307899
**THE MILLER FIRM, LLC**
The Sherman Building
108 Railroad Avenue
Orange, Virginia 22960
Tel: (540) 672-4224
Fax: (540) 672-3055
tshah@millerfirmllc.com



*Filed and Attested by the
Office of Judicial Records
23 JUL 2026 02:54 pm
C. SMITH*

ATTORNEYS FOR PLAINTIFFS

|  |  |
|---|---|
|  | **COURT OF COMMON PLEAS**<br>**PHILADELPHIA COUNTY** |
| **Robert Ranney and Jennifer Ranney**<br>26200 Road 204<br>Exeter, CA 93221 |  |
| Plaintiff, | July Term, 2026 |
| v. | Case No. _____ |
| **CORTEVA, INC.**<br>Serve R/A - The Corporation Trust Company<br>1209 Orange St.<br>Wilmington, DE 19801 | DEMAND FOR A JURY TRIAL |
| **CORTEVA AGRISCIENCE LLC**<br>Serve R/A - The Corporation Trust Company<br>1209 Orange St.<br>Wilmington, DE 19801 |  |
| **THE DOW CHEMICAL COMPANY**<br>Serve R/A - The Corporation Trust Company<br>1209 Orange St.<br>Wilmington, DE 19801 |  |
| **FMC CORPORATION**<br>2929 Walnut St.<br>Philadelphia, PA 19104 |  |
| Defendants |  |

1

Case ID: 260702772

## NOTICE TO PLEAD

**NOTICE** You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

**PHILADELPHIA COUNTY BAR ASSOCIATION**
LAWYER REFERRAL AND INFORMATION SERVICE
ONE READING CENTER
PHILADELPHIA, PENNSYLVANIA 19107 TELEPHONE:
(215) 238-6333
TTY (215) 451-6197

**AVISO** Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siquientes, usted tiene veinte (20) dias de plazo al partir de la fecha de lan demanda y la notificacion. Hace falta asentar una comparesencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIOI, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

**ASOCIACION DE LICENCIADOS DE FILADELFIA** SERVICIO DE REFERENCIA E INFORMACION LEGAL ONE READING CENTER
PHILADELPHIA, PENNSYLVANIA 19107
TELEPHONE: (215) 238-6333
TTY (215) 451-6197

2

Case ID: 260702772

Tayjes Shah, Identification No. 307899
**THE MILLER FIRM, LLC**
The Sherman Building
108 Railroad Avenue
Orange, Virginia 22960
Tel: (540) 672-4224
Fax: (540) 672-3055
tshah@millerfirmllc.com

ATTORNEYS FOR PLAINTIFFS

|  |  |
|---|---|
|  | **COURT OF COMMON PLEAS**<br>**PHILADELPHIA COUNTY** |

**Robert Ranney and Jennifer Ranney**
26200 Road 204
Exeter, CA 93221

       Plaintiff,              July Term, 2026

v.                        Case No. _____

**CORTEVA, INC.**            DEMAND FOR A JURY TRIAL
Serve R/A - The Corporation Trust Company
1209 Orange St.
Wilmington, DE 19801

**CORTEVA AGRISCIENCE LLC**
Serve R/A - The Corporation Trust Company
1209 Orange St.
Wilmington, DE 19801

**THE DOW CHEMICAL COMPANY**
Serve R/A - The Corporation Trust Company
1209 Orange St.
Wilmington, DE 19801

**FMC CORPORATION**
2929 Walnut St.
Philadelphia, PA 19104

       Defendants

3

Case ID: 260702772

### PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff hereby submits this Complaint ("Complaint") against the above-captioned Defendants. Plaintiff seeks compensatory and punitive damages as a result of injuries suffered from exposure to the Defendants' neurotoxic chlorpyrifos containing pesticides. Plaintiff makes the following allegations based upon personal knowledge and information and belief, as well as the investigation carried out by Plaintiff's Counsel.

### JURISDICTION AND VENUE

1.    This Court has personal jurisdiction over Plaintiff because Plaintiff consented to the jurisdiction of this Court by filing a case in this Court.

2.    This Court has personal jurisdiction over Defendants because, at all relevant times, Defendants regularly solicited and conducted business in Pennsylvania such that they can be said to have purposefully availed themselves of the privilege of conducting activities in Pennsylvania. Defendants have each exploited the agricultural markets in Pennsylvania, done substantial business in Pennsylvania, and realized substantial profits as a result.

3.    Defendant FMC is domiciled in Pennsylvania because its principal place of business is in Philadelphia and it is registered to do business in Pennsylvania. It is essentially at home in Pennsylvania and this Court possesses general jurisdiction over FMC.

4.    Defendants Corteva, Inc. and Corteva Agriscience LLC (collectively, "Corteva") have purposefully availed themselves of the privilege of conducting activities in Pennsylvania, including exploiting the Pennsylvania market for agricultural products, entering into contracts with Pennsylvania-domiciled corporations (including FMC), and marketing and selling Chlorpyrifos to Pennsylvania distributors and end-users:

4

Case ID: 260702772

a.      At all relevant times, Corteva, Inc. and its predecessors have been registered to do business in Pennsylvania as a foreign corporation. When Corteva registered to do business in Pennsylvania, it consented to the general jurisdiction of Pennsylvania courts. Mallory v. Norfolk Southern Railway Co., 600 U.S. 122 (2023).

b.      Corteva maintains a corn breeding and field research station in Lancaster County, Pennsylvania.

c.      Corteva marketed Chlorpyrifos to end-users in Pennsylvania. This included ads and other promotional materials.

d.      Prior to exiting the Chlorpyrifos market in or about 2020, Corteva sold and distributed Chlorpyrifos to distributors and end-users in Pennsylvania.

5.      Corteva's myriad contacts with Pennsylvania are more than random, isolated, or fortuitous; they are purposeful, continuous, and sufficiently related to Plaintiff's allegations that Chlorpyrifos causes Parkinson's disease such that it would not offend traditional notions of fair play and substantial justice to maintain this suit against Corteva in Pennsylvania.

6.      Defendant The Dow Chemical Company has purposefully availed itself of the privilege of conducting activities in Pennsylvania, including registering to do business in Pennsylvania as a foreign corporation. In addition to selling its materials and specialty chemicals products to buyers in Pennsylvania and registering to do business, The Dow Chemical Company maintains at least four research and/or manufacture facilities in Pennsylvania.

7.      Venue is proper in Philadelphia County because at least one of the Defendants, FMC Corporation, maintains its principal place of business in Philadelphia County and all Defendants conduct substantial business in Philadelphia County. See Pa. R. C.P. 1006(c) and 2179.

8.      This is an action for damages in excess of fifty thousand dollars ($50,000).

5

Case ID: 260702772

9.      Plaintiff has timely-filed this action within two years of discovering his causes of action as defined and required by Pennsylvania 42 Pa. Cons. State. § 5524(2). Further, Defendants fraudulently concealed facts that delayed Plaintiff's ability to know his injuries and its cause.

## PLAINTIFF

10.     Plaintiff Robert Ranney is a natural person and at all relevant times a resident and citizen of Tulare County, CA. Plaintiff brings this action for personal injuries sustained by exposure to Chlorpyrifos. As a direct and proximate result of being exposed to Chlorpyrifos, Plaintiff developed Parkinson's disease.

## DEFENDANTS

### Dow/Corteva

11.     The Dow Chemical Company discovered chlorpyrifos's insecticidal properties in the 1950s and patented it and registered it for sale in the early 1960s. Between the time it first sold Chlorpyrifos in 1965 and its 2020 decision[1] to discontinue the manufacture and sale of Chlorpyrifos, Dow was by far the largest manufacturer and seller of Chlorpyrifos sold in the United States.

12.     In 1989, The Dow Chemical Company formed DowElanco, a joint venture with pharmaceutical company Eli Lilly & Company. In 1997, Dow bought out Eli Lilly's stake in DowElanco and renamed the entity Dow AgroSciences LLC. In 2019, after a temporary merger with DuPont, Dow spun off Dow AgroSciences as Corteva, Inc., a separate entity that is sometimes referred to as "Corteva Agrisciences." On information and belief, at the time of its formation,

---

[1] On February 7, 2020, Dow announced its intention to cease manufacture and sale of Chlorpyrifos. On information and belief, Dow had ceased manufacturing Chlorpyrifos by the end of 2020. However, Dow maintained active FIFRA registrations for some Chlorpyrifos products until as recently as June 25, 2024.

6

Case ID: 260702772

Corteva, Inc. assumed the liabilities of Dow AgroSciences LLC. On information and belief, Corteva, Inc. operates through its wholly-owned subsidiary, Corteva Agriscience LLC. Dow sold chlorpyrifos-containing insecticides under various brand names, including but not limited to: Dursban (directed to the residential market), Lorsban (directed to the agricultural market), and Cobalt. On information and belief, The Dow Chemical Company inherited some or all of the liabilities of its predecessors The Dow Chemical Company, DowElanco, and Dow AgroSciences LLC related to Chlorpyrifos.

13.     Defendant Dow Chemical Company was the parent company of Dow AgroSciences (n/k/a Defendant Corteva Inc.), and effectively controlled Dow AgroSciences. More importantly, while Dow AgroSciences was, during the 2000s, the legal registrant and seller of Lorsban and all other Dow-family chlorpyrifos and chlorpyrifos oxon products in the United States, Dow Chemical was the actual manufacturer of chlorpyrifos and chlorpyrifos oxon. In other words, while Dow AgroSciences was headquartered in Indianapolis, Indiana, during the 2000s, the actual chlorpyrifos production facilities were located in Midland, Michigan, and operated, upon information and belief, by Dow Chemical Company and employees of Dow Chemical Company. In fact, these chlorpyrifos production facilities were, upon information and belief, inextricably integrated into Dow Chemical's Midland production facilities and the production of other chemicals sold for other purposes, at least some of which were marketed and sold directly by Dow Chemical, not Dow AgroSciences. Dow Chemical therefore had its own stake in the continued production and sale of chlorpyrifos and chlorpyrifos oxon, separate and apart from the contribution of its subsidiary, Dow AgroSciences, to parent Dow Chemical's bottom line. These entities— Corteva, Dow AgroSciences, the Dow Chemical of the 2000s and earlier and the Dow Chemical of today—are collectively referred to as "Dow" unless otherwise noted.

7

Case ID: 260702772

*FMC*

14.     FMC Corporation, formerly known as the Food Machinery Corporation, was founded to manufacture spray pumps used in agricultural settings, including pesticides. In 2015, FMC acquired Cheminova, A/S, a Danish agrochemical company. Both before and after the acquisition, Cheminova registered for sale, designed, manufactured, distributed, and sold chlorpyrifos-containing insecticide products in the United States. On information and belief, FMC assumed the liabilities associated with Cheminova's prior sales of Chlorpyrifos when it acquired the company. Both before and after acquiring Cheminova, FMC sold its own chlorpyrifos- containing insecticide products in the United States. FMC sold chlorpyrifos-containing insecticides under various brand names, including but not limited to Bolton, Nufos, Stallion, and Durmet.

15.     FMC is incorporated in Pennsylvania and its principal place of business is in Philadelphia.

## TERMS

16.     As used in this Complaint, "Chlorpyrifos" refers to all formulations of insecticides containing the active ingredient chlorpyrifos (O,O-diethyl O-3,5,6-trichloro-2-pyridyl phosphorothioate), including, but not limited to, Dursban, Lorsban, Cobalt, Bolton, Nufos, and Stallion.

17.     As used in this Complaint, "formulator" refers to a company that combines technical chlorpyrifos and other essential Chlorpyrifos chemical ingredients with other chemicals to create a product that is sold to end-users. As used here, the active ingredient(s) for all such products include(s), but is not necessarily limited to, chlorpyrifos.

## THE ALLEGATIONS

*Discovery and Design of Chlorpyrifos*

8

Case ID: 260702772

18.     Chlorpyrifos is a man-made compound that belongs to a class of chemicals called organophosphates. Organophosphates are distinguished from other chemicals by the fact that they contain a phosphorous atom double-bonded to an oxygen or sulfur atom and single-bonded to three other oxygen-containing substituents.

19.     In the 1930s, chemists working for the German chemical giant IG Farben discovered that organophosphates are powerful inhibitors of the neurotransmitter[2] cholinesterase.

20.     Cholinesterase is critical to the proper function of animal brains, including human brains. The brain uses cholinesterase to break down two other neurotransmitters, acetylcholine and butyrylcholine. There are two types of cholinesterase, one each for acetylcholine and butyrylcholine. The first is acetylcholinesterase. The second is butyrylcholinesterase..The brain cells in animal brains use acetylcholine and butyrylcholine to tell the animal's muscles to move. These neurotransmitters operate, in essence, as the brain's "on-switch" for muscles. The brain uses cholinesterase as its "off-switch" for acetylcholine and butyrylcholine. Without cholinesterase, animal brains cannot stop telling muscles to fire, resulting in numerous serious health problems, up to and including death, for the affected animal.[3]

21.     IG Farben discovered that, by disabling the cholinesterase off-switch, organophosphates exhibit fatal neurotoxicity to both insects and human beings alike. As a group, organophosphates now include some of the world's most toxic chemical weapons, including sarin, VX gas, and the Novichok class of chemical agents.

---

[2] A neurotransmitter is a chemical used by brain cells, called neurons, to send signals to other neurons.

[3] Or, in the words of Dow's website, as of March 2003: "Chlorpyrifos is an organophosphate insecticide. Like other organophosphates, its insecticidal action is due to the inhibition of the enzyme acetylcholinesterase resulting in the accumulation of the neurotransmitter, acetylcholine, at the nerve endings. This results in excessive transmission of nerve impulses, which causes mortality in the target pest."

Case ID: 260702772

22.     In the 1950s, scientists at Dow synthesized chlorpyrifos and recognized its potential as an insecticide. Dow applied to patent chlorpyrifos in 1962. Dow began selling chlorpyrifos in the U.S. in the One of the patented phosphate pesticide formulations (diethyl 3,5,6-trichloro-2-pyridyl phosphate) is the oxygen analog of Chlorpyrifos and is known as "chlorpyrifos oxon."

23.     Chlorpyrifos oxon is a much more acutely potent and deadly neurotoxin, belonging to the same family of organophosphate-based pesticides as the chemical warfare agent, Sarin. In the mid 1930s, a German chemist, Gerhard Schrader, developed Sarin as a pesticide to combat insects adversely impacting German agriculture. Because of its extraordinary human neurotoxicity, Sarin was never implemented as an agricultural pesticide in Germany. Like Sarin, chlorpyrifos oxon is an extremely potent human neurotoxin.

24.     Even though chlorpyrifos oxon (hereinafter "oxon") was included as a pesticide in the chlorpyrifos patent, it has never been registered or presented for registration with and to the EPA as a pesticide due to its extreme neurotoxicity.

25.     When Chlorpyrifos is mixed with water (almost always chlorinated treated water or water recycled from agricultural fields that is contaminated with brominated pesticides) and applied to the fields and orchards, it begins to convert to the unregistered, but Dow-patented pesticide, chlorpyrifos oxon.

26.     Chlorpyrifos became vital to Dow's business after Dow began to face stiffening competition and diminishing profits in its core operations in the petrochemicals and plastics markets.In 1978, thirty of Dow's senior managers met to discuss refocusing the company away from the petrochemicals and plastics industries. As of 1979, those businesses comprised 85% of Dow's overall business, but Dow management recognized that the industries had become crowded since Dow began dominating them in the 1930s. Thus, they decided to shift strategies and focus

Case ID: 260702772

more on higher value-added products, including agricultural chemicals and consumer products, which they hoped would contribute 50% of the company's overall business by 1987. Implementing this strategy, Dow sold significant portions of its petrochemicals business in 1982, 1983, and 1984. Immediately following these significant sales, Dow acquired multiple consumer products businesses. By 1986, Dow had fully implemented the strategy envisioned in 1978 and the higher value-added products, like Chlorpyrifos, constituted 52% of Dow's overall revenues.

27.    By the early 1980s, Dow's incentive to push Chlorpyrifos had grown even stronger. Its pivot from petrochemicals to agricultural chemicals and consumer products was paying dividends, as the company's agricultural chemicals business alone was bringing in approximately $500 million annually.

28.    In 1989, Dow formed a joint venture with Eli Lilly and Company8, which it called DowElanco, to expand its focus on the agricultural chemicals industry. Eli Lilly's Elanco Products Company division had been a major player in the expanding market for veterinary pharmaceuticals. Internal assessments performed in connection with the merger evince Chlorpyrifos's importance to Dow: pyridine[4] pesticides like Chlorpyrifos comprised 70% of Dow's agricultural chemicals business, which had become its core business. In 1997, Dow bought out Eli Lilly's interest in DowElanco, which it then renamed "Dow Agrosciences." Purchasing Eli Lilly's Elanco division was the first in a spree of Dow acquisitions in the agricultural chemicals sector in the late 1990s, cementing the company's shift towards agricultural chemicals, like Chlorpyrifos.

---

[4] A "pyridine" pesticide is any pesticide that contains a pyridine ring, a ring of five carbon atoms and one nitrogen atom bonded in a hexagon

Case ID: 260702772

29.     By the time Dow bought Eli Lilly out of DowElanco, Chlorpyrifos had become the overwhelmingly dominant force in the American insecticide market. By 1992, household use surveys showed that 17 percent of American homes used Chlorpyrifos. An estimated 200 million household-related applications were being made each year, in addition to the 10 to 20 million pounds of Chlorpyrifos applied in agricultural settings and the more than one million pounds applied as termiticide. A 1994 survey found chlorpyrifos residues in the urine of 82% of the 1,000 Americans tested. Chlorpyrifos was everywhere.

30.     In the early 1990s, the New York Attorney General (the "NYAG") investigated Dow for making false and misleading safety claims in its advertising of Chlorpyrifos—which was not attached to the product and was outside the scope of the EPA-approved label—including claims that "No significant adverse health effects will likely result from exposures to Dursban even at levels substantially above those expected to occur when applied at label rates." In 1994, Dow entered an "assurance of discontinuance," essentially a settlement agreement, with the NYAG in which the company agreed to stop making false safety claims in its Chlorpyrifos marketing materials that were outside the scope of the EPA-approved label.

31.     Later that same year, litigation regarding Chlorpyrifos's damaging effects on the developing brains of fetuses and infants uncovered Dow's shocking failure to report to the EPA 249 "adverse health effects" associated with the use of Chlorpyrifos. FIFRA requires pesticide registrants to report such events to the EPA within thirty days. Dow simply refused to report these adverse health effects until its knowledge of them was uncovered as part of the discovery process in the 1994 litigation. As punishment for these hundreds of violations, the EPA issued Dow its then largest-ever fine.

Case ID: 260702772

32.    The NYAG's investigation of Dow resumed in the early 2000s and it filed suit in a Manhattan court regarding Dow's violations of the 1994 assurance. To resolve the suit, Dow agreed in 2003 to pay a fine of $2 million and to cease all pesticide advertising in the state of New York that was not attached to the product and inconsistent with the EPA-approved label.

**Evidence Accrues that Chlorpyrifos is Seriously Neurotoxic in Various Ways**

33.    As Chlorpyrifos's market dominance grew, so too did evidence of its neurotoxicity and Dow's efforts to ignore that evidence.

34.    Since Dow first applied to patent it, Chlorpyrifos's inventors, formulators, distributors, and sellers have known that Chlorpyrifos is toxic to the human brain. Chlorpyrifos kills insects by inhibiting a critical neurotransmitter that both insect and human brains use to signal muscle movements. Many of Chlorpyrifos's chemical "cousins" within the organophosphate family of chemicals, including sarin and VX nerve gases, kill human beings by this same mechanism.

35.    In the late 1960s, Dow conducting an unethical study exposing prisoners to Chlorpyrifos. The study data showed that even low and middle dose showed neurotoxic effects in humans. However, Dow scientists falsified the data and reported only neurotoxic effects in the high dose. This fraudulent study was used for decades to skew the results of scientific and regulatory risk-benefit assessments by providing a falsified exposure level at which no effects on humans were expected.

36.    By the early 1970s, the scientific literature began publishing reports of organophosphate poisoning resulting from Chlorpyrifos's neurotoxicity. For example, a 1971 article published in the world-renowned journal JAMA observed that "organophosphates are the pesticides most often involved in serious human poisoning" and warned that "[t]hat involvement is likely to increase" in light of the DDT ban. As another example, in 1986, a publication in the Journal of Occupational

13

Case ID: 260702772

Medicine described the poisoning by Chlorpyrifos of five office workers whose building had been sprayed. The office workers "developed symptoms compatible with organophosphate intoxication" and their cholinesterase levels did not return to normal for three months following the incident.

37.     More toxicological evidence accrued evidencing the extent of Chlorpyrifos's neurotoxicity, which went well beyond its primary mechanism of AChE inhibition. For example, studies conducted in the 1990s demonstrated Chlorpyrifos's ability to generate reactive oxygen species, to damage DNA, and to cause leakage of lactate dehydrogenase (a signal of cell death). Other studies showed that Chlorpyrifos disrupts the brain's ability to utilize two other critical neurotransmitters, dopamine and serotonin. Building on this research, subsequent studies proved that, by generating reactive oxygen species, chlorpyrifos causes the death of dopaminergic cells by inhibiting the activity of mitochondria. Mitochondria, often described as the powerhouse of all cells, are critical to the proper functioning of the human brain because the brain consumes the bulk of the energy used by the human body.

38.     Between 1993 and 1996 alone, nearly 18,000 suspected Chlorpyrifos poisonings were reported to the EPA. Worse still, the majority of these poisonings involved children under the age of six.

39.     In 1997, Dow agreed to withdraw Chlorpyrifos from a select handful of small, specialized markets, including indoor foggers and pet shampoos. Doing so bought the company time to continue selling Chlorpyrifos to larger residential, agricultural, and other occupational markets.

40.     In 1998, Dow submitted to the EPA a study it had commissioned regarding the Chlorpyrifos's developmental neurotoxicity. The researchers evaluated Chlorpyrifos's developmental neurotoxicity by exposing pre- and post-natal rats to Chlorpyrifos and measuring

14

Case ID: 260702772

various physiological and behavioral markers of development. Not only did Dow fund the study, the study's lead author was a Dow employee. Unsurprisingly, the study concluded that Chlorpyrifos exposure does not cause neurodevelopmental harm.

41.    Dow simultaneously commissioned another study, this time focusing on whether Chlorpyrifos exposure exacerbates sensitivity to cholinesterase inhibition. Again, Dow's own employee led the study and again the study concluded that Chlorpyrifos exposure does not damage neurodevelopment.

42.    Dow relied on these studies to refute claims of Chlorpyrifos's developmental neurotoxicity for the next twenty years.

43.    But Dow's efforts could not withstand the growing scientific consensus regarding Chlorpyrifos's broad and deep neurotoxicity. In 1999, an EPA Hazard Identification Assessment Review Committee recommended significantly increased restrictions on the use of Chlorpyrifos ("HIARC"). Despite relying in part on Dow's subsequently-discredited 1972 prisoner study, the HIARC concluded that humans exhibit greater sensitivity to Chlorpyrifos's mechanism of action, inhibition of acetylcholinesterase, than do animals, including the rats studied in the Dow-commissioned studies. Directly contravening one of the Dow-commissioned studies, the HIARC concluded that "there is sufficient evidence in the scientific literature to suggest that exposure to chlorpyrifos results in increased sensitivity and susceptibility to neonates as compared to adult rats."

44.    Dow responded by going on a public relations offensive with advertisements not attached to the product and making claims outside the scope of the EPA-approved label.. It solicited advertisements in farmer trade journals that made apocalyptic threats should Chlorpyrifos be banned. One classic example depicts a farmer's truck, covered in ants, with empty produce boxes,

Case ID: 260702772

behind a sign that reads "Fresh Fruits and Veggies" covered by an "Out of Business" sticker such that the sign reads "Fresh Out of Business;" the cartoon is captioned "The World Without Lorsban" (Lorsban was Dow's agriculture-focused Chlorpyrifos brand).

45.    Eventually, though Dow gave up the ghost and sued for peace, sacrificing the residential market to prevent a wholesale ban on Chlorpyrifos. In June 2000, the EPA announced that it had reached a deal with Chlorpyrifos registrants to voluntarily withdraw virtually all registrations for residential Chlorpyrifos products. The deal preserved virtually all of the agricultural market, as well as the bulk of the occupational markets (such as use on golf courses).

**FMC Enters the Market**

46.    Despite Chlorpyrifos's checkered regulatory history and the substantial evidence of its neurotoxicity, FMC's predecessor, Cheminova, began selling a chlorpyrifos-containing product, which it branded "Nufos," in 1996. Cheminova registered a second chlorpyrifos-containing product in 2012, which it branded "Bolton." FMC itself began selling a chlorpyrifos- containing product, which it branded "Stallion," in 2011. FMC acquired Cheminova in 2015.

47.    On information and belief, FMC, like Dow, failed to adequately study Chlorpyrifos's neurotoxicity. On information and belief, FMC knew, or should have known, that Chlorpyrifos interferes with critical neurological functions and that chronic exposure to Chlorpyrifos at levels likely to be encountered by those exposed to its Chlorpyrifos products can cause irreversible neurological injuries, including Parkinson's disease.

**Dow's Chlorpyrifos Research is Debunked, Leading It to Finally Abandon Chlorpyrifos**

48.    In 2018, independent researchers, including an editor-in-chief of the peer- reviewed journal Environmental Health, published an analysis (Mie et al. (2018)) of the disagreement between

16

independent research and industry-funded research regarding Chlorpyrifos's neurotoxicity. Mie et al. observed that "independent epidemiological, in vivo and in vitro studies . . . point[] to adverse health effects of chlorpyrifos on the developing nervous system" and that "[t]hese outcomes have been observed at exposure levels far below those . . . in an industry-funded developmental neurotoxicity (DNT) study commissioned for regulatory purposes" by Dow (i.e., Maurissen et al. (2000)). Mie et al. (2000) noted that the differing conclusions were likely critical in securing EPA approval of Chlorpyrifos and that Dow had repeatedly submitted the study to the EPA in support of Chlorpyrifos's registration, including as recently as 2015.

49.    But Mie et al. identified multiple shortcomings marring the Dow-sponsored research. First, the Dow researchers analyzed the weight of the entire rat subject brains, rather than analyzing the weights of specific brain regions and comparing them to the overall brain weight. The latter approach allows researchers to identify potential differential impacts on brain regions caused by the compound being researched (in this case, Chlorpyrifos). As Mie et al. observed, the EPA has identified weighing the entire brain, rather than piece-by-piece, as an "inappropriate and inconclusive manipulation of the data." When Mie et al. analyzed the weights of the separate brain regions,[5] their analysis showed statistically significant changes in cerebellum height at all three Chlorpyrifos exposure levels, "indicating the presence of [developmental neurotoxicity] at all dose levels tested." By comparison, Maurissen et al. (2000)'s analysis, limited to overall brain weight, reported changes in brain weight only at the highest dose. Mie et al. further noted that the Dow study failed to account for the differences in the prenatal neurodevelopment of rats and humans and that Maurissen et al. had adjusted their statistical protocol after the fact, without explanation,

---

[5] As Mie et al. note, Maurissen et al. (2000) reports the weight of some, but not all, separate regions of the rat brains analyzed in the study. Mie et al. also note that Maurissen et al. (2000) does not explain why some, but not all, regional weights were reported.

Case ID: 260702772

and assigned 0.02 as the cut-off for statistical significance, an unusually low figure (typically, the figure is 0.05) that rendered detection of a statistically significant effect far less likely.

50.    Just two years later, another group of independent researchers from the University of Washington published (Sheppard et al. (2020)) a re-analysis of Dow's 1972 prisoner study (Coulston et al. (1972)) in the peer-reviewed journal Environment International. Sheppard et al. re-analyzed the data collected by Coulston et al., using both the original researchers' statistical method and modern computational tools, and found two serious flaws that changed the study's overall conclusions. First, because treatment dates and durations varied among the exposed groups, the original analysis could not estimate differences in effect between treatment groups; because of this, Coulston et al. could compare only between each exposed group and the controls, and could not compare exposed groups to one another. This inability to compare exposed groups to one another precluded the possibility of evaluating dose-response relationships, a critical measure of causal relationships like the Chlorpyrifos-neurotoxicity relationship Coulston et al. were studying.

51.    Second, Coulston et al. simply omitted valid data they collected from their analysis. Specifically, Coulston et al. ignored baseline acetylcholinesterase level tests conducted for the low- and mid-level exposure groups – the two groups on which Dow based the no-effects level it reported to the EPA and California Department of Pesticide Regulation for decades.[6] By ignoring these baseline measurements, Coulston et al. found that the differences in acetylcholinesterase levels between the exposed and unexposed groups were not statistically significant. Once the valid baseline measurements were re-introduced to the analysis, the differences in AChE levels achieved

_____

[6] Dow only ceased relying on Coulston et al. (1972) in its Chlorpyrifos submissions to the EPA in 2009, after the EPA established a Human Studies Review Board (the "HSRB") to evaluate all studies that involve intentional human exposure or dosing. Because Coulston et al. intentionally exposed prisoners to Chlorpyrifos, the study was slated for review by the HSRB. However, Dow withdrew Coulston et al. (1972) before the HSRB had a chance to review it.

Case ID: 260702772

statistical significance and the no effects level could not have been set based on the Coulston et al. study, because effects were observed even at the lowest exposure level evaluated in that study.

52.    Meanwhile, the market for Chlorpyrifos began to both dry up and split up. In addition to FMC/Cheminova, many smaller companies entered the Chlorpyrifos market once the patent expired in the early 2000s. Worse still for Chlorpyrifos registrants, the overall market for Chlorpyrifos shrunk significantly in the first two decades of the 21st century. Between 1987 and 1998, an average of 10,000 tons of Chlorpyrifos was applied on American farms. By 2016, that figure had dropped to 2,000 tons while just 2,700 tons were applied in all American contexts in 2017.

53.    In early 2020, facing diminishing returns and an increasingly unfavorable regulatory environment, Dow announced its intention to exit the Chlorpyrifos market. Multiple other Chlorpyrifos manufacturers and sellers followed suit, though many continue to sell Chlorpyrifos to this day.

***Defendants Never Studied Chlorpyrifos's Link to Parkinson's but Independent Researchers have Demonstrated a Causal Relationship***

54.    Despite designing, manufacturing, distributing, and selling Chlorpyrifos for nearly six decades; despite Chlorpyrifos's belonging to a class of chemicals first developed by the Nazis as chemical weapons; and despite the substantial toxicological and epidemiological evidence that Chlorpyrifos is severely neurotoxic and that it causes Parkinson's disease, not one of the Defendants sufficiently studied Chlorpyrifos's relationship with Parkinson's disease.

55.    Indeed, not one of the Defendants conducted any studies regarding the chronic neurological effects of Chlorpyrifos exposure on adults, millions upon millions of whom purchased, used, and were exposed to Chlorpyrifos.

19

Case ID: 260702772

56. The studies that Defendants did perform, including those it submitted to the EPA, were often poorly designed and executed, if not outright falsified. The deficiencies of their studies, whether intentional or not, masked the true relationship between Chlorpyrifos and its deleterious effects on the human brain.

57. Furthermore, Defendants actively suppressed outside research by failing to report adverse health effects of Chlorpyrifos exposure to the EPA, the California DPR, or in the public literature; by conducting shoddy and misleading studies of Chlorpyrifos exposure; and by falsely advertising Chlorpyrifos as safe for long-term use—outside the scope of the EPA-approved label—despite being repeatedly caught out for doing so.

58. Rather than redesign Chlorpyrifos or withdraw it from the market, Defendants fought strenuously to forestall regulation of Chlorpyrifos. For example, Defendants responded to the EPA's 2016 decision to revoke all Chlorpyrifos tolerances by intensely lobbying the EPA through their front group CropLife America. Soon after the 2017 change in administration, CropLife America's top brass met behind closed doors with the EPA's new leadership. The lobbying worked. Soon after the meeting, the EPA announced that it was abandoning the analysis of its own scientists in favor of those at the industry-friendly Department of Agriculture and reversing its stated intention to ban Chlorpyrifos. CropLife America lobbyist was appointed senior adviser to the Secretary of Agriculture, the very agency whose analysis was used to override the EPA scientists who recommended banning Chlorpyrifos.

59. Had Defendants adequately tested Chlorpyrifos earlier then it would not have been allowed to continue selling the product in California. In 2019, California decided to ban Chlorpyrifos following "mounting evidence, including recent findings by the state's independent Scientific Review Panel on Toxic Air Contaminants, that the pesticide causes serious health effects in

20

Case ID: 260702772

children and other sensitive populations at lower levels of exposure than previously understood. These effects include impaired brain and neurological development." [7]

60.    As part of California's decision to ban Chlorpyrifos, it considered whether Defendants could "develop control measures to protect the health of farm workers and others living and working near where the pesticide is used," such as enhanced labeling or instruction to applicators. California determined that such "additional control measures are not feasible" to protect farmworkers and nearby residents. California also considered the availability of safer alternatives to Chlorpyrifos in determining that the risks of allowing Chlorpyrifos use outweighed the benefits.

61.    Epidemiology studies conducted by independent researchers have confirmed that exposure to Chlorpyrifos can cause Parkinson's disease.  For example, a 2025 study by Hasan, et al. reported a 2.5-fold increased risk for Parkinson's disease among long-term California residents residing within 500 meters of Chlorpyrifos applications. A 2008 study by Dhillon, et al., reported a doubling of the risk of Parkinson's disease for residents of Texas who reported personally spraying Chlorpyrifos. A 2013 study by Narayan, et al. reported a 2.73-fold increased risk for Parkinson's disease among frequent household users of Chlorpyrifos. Numerous other studies looking at insecticide or organophosphates in general have also confirmed an increased risk of Parkinson's disease.

62.    Animal studies by independent researchers, including Hasan (2025) have also reported that Chlorpyrifos causes dopaminergic neuron loss—a hallmark of Parkinson's disease—in rodents through various exposure routes including inhalation.

63.    In 2022, a panel of experts at the World Health Organization issued a report calling for a global ban on Chlorpyrifos in order to curb the rising number of Parkinson's disease diagnoses.

---

[7] https://www.cdpr.ca.gov/2019/05/08/california-acts-to-prohibit-chlorpyrifos-pesticide/

Case ID: 260702772

64.     In 2025, the 186 member countries of the Stockholm Convention, a United Nations group, agreed that they "must take measures to eliminate the production and use of" Chlorpyrifos due to its health risks. This conclusion was reached after considering any potential economic and societal costs of a ban and after considering that there were multiple safer alternative pesticides and crop protection management techniques available.  After considering all of the benefits of Chlorpyrifos these countries determined that because "chlorpyrifos is likely, as a result of long-range environmental transport, to lead to significant adverse effects on human health" a ban was warranted with very limited exceptions.[8]

### Plaintiff Was An End-User of Chlorpyrifos Who Was Exposed in A Reasonably-Foreseeable Way

65.     Plaintiff Robert Ranney was regularly exposed to Chlorpyrifos through personal application of the product from 1995-2005 and due to his proximity to agricultural use from 1965-2020.   During this period, he was exposed to Chlorpyrifos designed, manufactured, distributed, and/or sold by Defendants.  Plaintiff further personally applied Chlorpyrifos on various occasions. Plaintiff was also exposed to the product because he lived next to farms where Chlorpyrifos was sprayed. California Pesticide Use Reports confirm that Plaintiff was exposed to Defendants' products including Nufos (manufactured by FMC) and Lorsban (manufactured by Dow/Corteva)

66.     Plaintiff diagnosed with Parkinson's disease in 2026.

67.     At all times during which Plaintiff was exposed to Chlorpyrifos, safer alternatives were available, and safer designs were technologically and economically feasible. For example, numerous broad-spectrum pyrethroid and carbamate insecticides, as well as at least one broad-

---

[8] https://chm.pops.int/TheConvention/POPsReviewCommittee/Recommendations/tabid/243/Default.aspx

22

Case ID: 260702772

spectrum neonicotinoid insecticide, were available during the period when Plaintiff was exposed to Chlorpyrifos.

**Parkinson's Disease Is Progressive, Debilitating, Lifelong, Incurable, and Ultimately Fatal**

68.     Parkinson's disease is a progressive neurodegenerative disorder of the brain that primarily affects the motor system—the part of the central nervous system that controls movement.

69.     The characteristic symptoms of Parkinson's disease are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

70.     Parkinson's disease's primary motor symptoms often result in "secondary" motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

71.     Non-motor symptoms-such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression-are present in most cases of Parkinson's disease, often for years before any of the primary motor symptoms appear.

72.     There is currently no cure for Parkinson's disease; no treatment will stop or reverse its progression; and the treatments most commonly prescribed for its motor symptoms tend to become progressively less effective, and to increasingly cause unwelcome side effects, the longer they are used.

73.     The primary pathophysiological hallmark of Parkinson's disease is the death of dopaminergic neurons in a region of the brain called the substantia nigra. Dopaminergic neurons are the brain cells involved in the production and use of dopamine. Like acetylcholinesterase,

Case ID: 260702772

dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

74.     Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of Parkinson's disease.

75.     The presence of Lewy bodies (insoluble aggregates of a protein called alpha- synuclein) in many of the remaining dopaminergic neurons in the substantia nigra is another of the primary pathophysiological hallmarks of Parkinson's disease.

76.     Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

77.     Scientists who study Parkinson's disease generally agree that oxidative stress is a major factor—if not the precipitating cause of—the degeneration and death of dopaminergic neurons in the substantia nigra and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of the disease.

78.     While the precise mechanism by which Chlorpyrifos causes Parkinson's disease is not perfectly understood, scientific evidence shows that Chlorpyrifos causes numerous changes in the brain that are consistent with mechanisms known to result in the hallmarks of Parkinson's disease. For example, Chlorpyrifos exposure causes reactive oxygen species, damages DNA, and inhibits the activity of mitochondria. The loss of mitochondrial function is particularly important in the development of Parkinson's disease because proper functioning of the brain requires so much energy and, within the brain, the substantia nigra is a particularly "power-hungry" region; the

Case ID: 260702772

diminution of mitochondrial function thus impacts the substantia nigra's dopaminergic cells to a greater degree than it does other regions of the brain.

79.     Plaintiff's Parkinson's disease will progress to become entirely debilitating. Plaintiff will lose the ability to control his motor functions. They are or will become unable to live independently. Parkinson's disease has or will result in permanent physical injuries, pain, mental anguish, and disability. These injuries will continue for the rest of Plaintiff's life.

80.     Plaintiff will be required to incur significant costs and expenses related to medical care and treatment, as well as related costs.

81.     Plaintiff has become unable to work or hold down steady employment as a result of his Parkinson's disease.

82.     Plaintiff has suffered general (non-economic) damages in a sum in excess of the jurisdictional minimum of this Court.

83.     Plaintiff has suffered special (economic damages) in a sum in excess of the jurisdictional minimum of this Court.

***Plaintiff's Claims Are Timely***

84.     Plaintiff filed suit within two years of learning that his exposure to Chlorpyrifos designed, formulated, and manufactured by Defendants caused his Parkinson's disease.

85.     Plaintiff had no reason to suspect that his diagnosis had anything to do with their exposure.

86.     Plaintiff was never told either by a medical professional, by media, or by the Defendants that exposure to Chlorpyrifos could cause him to suffer Parkinson's disease.

87.     Plaintiff did not know of the claims and their underlying facts asserted in this complaint, nor could any reasonably prudent person know of such claims.

Case ID: 260702772

88. Plaintiff did not possess sufficient facts to put him on notice that the wrongs and the acts and omissions discussed herein had been committed because Defendants were and continue to conceal the acts and omissions noted above.

89. At all relevant times, Plaintiff exercised reasonable diligence in investigating potential causes of their injuries by discussing their injuries with healthcare providers. None of the conversations gave Plaintiff a reason to suspect, or reasonably should have given Plaintiff a reason to suspect, that Chlorpyrifos or Defendants' tortious conduct was the cause of such injuries.

90. Plaintiff was reasonably unaware, and had no reasonable way of knowing, that his injuries described above were caused by Defendants' conduct.

91. Further, Defendants' acts and omissions misled Plaintiff with regard to his causes of action and prevented him from asserting such rights because the facts which would support their causes of action as alleged in this complaint were not apparent to a reasonably prudent person.

92. Defendants also prevented Plaintiff from asserting his rights by committing affirmative independent acts of concealment as noted above upon which Plaintiff relied.

93. Defendants' misconduct and fraudulent concealment of the relevant facts deprived Plaintiff and his physicians of vital information essential to the pursuit of the claims in this complaint, without any fault or lack of diligence on their part. Plaintiff relied on Defendants' misrepresentations and omissions and therefore could not reasonably have known or become aware of facts that would lead a reasonable, prudent person to make an inquiry to discover Defendants' tortious conduct.

94. Defendants also affirmatively induced Plaintiff to delay bringing this complaint by and through their acts and omissions as alleged herein.

95. Plaintiff relied on Defendants' misrepresentations.

Case ID: 260702772

**CAUSES OF ACTION**

**COUNT I— NEGLIGENCE**
**(ALL DEFENDANTS)**

96.    Plaintiff incorporates the foregoing paragraphs as if set forth fully herein.

97.    Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, sale, and/or distribution of Chlorpyrifos into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

98.    Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, sale, testing, quality assurance, quality control, and/or distribution of Chlorpyrifos into interstate commerce in that Defendants knew or should have known that using Chlorpyrifos created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of Parkinson's disease, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

99.    When inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it has been sprayed or areas near where it has been sprayed, Chlorpyrifos was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause neurodegenerative disease, including Parkinson's disease

100.    The negligence by the Defendants, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

27

Case ID: 260702772

a. Manufacturing, producing, promoting, formulating, creating, and/or designing Chlorpyrifos without thoroughly testing it;

b. Failing to test Chlorpyrifos and/or failing to adequately, sufficiently, and properly test Chlorpyrifos;

c. Not conducting sufficient testing programs to determine whether or not Chlorpyrifos was safe for use; in that Defendants herein knew or should have known that Chlorpyrifos was unsafe and unfit for use by reason of the dangers to its users;

d. Not conducting sufficient testing programs and studies to determine Chlorpyrifos's neurotoxic properties even after Defendants had knowledge that Chlorpyrifos is, was, or could be neurotoxic;

e. Negligently marketing and advertising the use of Chlorpyrifos without sufficient knowledge as to its dangerous propensities and outside the scope of the EPA-approved label;

f. Negligently advertising that Chlorpyrifos was safe for use for its intended purpose, and/or that Chlorpyrifos was safer than ordinary and common items such as caffeine, when, in fact, it was unsafe;

g. Negligently designing Chlorpyrifos in a manner which was dangerous to its users;

h. Negligently manufacturing Chlorpyrifos in a manner which was dangerous to its users;

i. Negligently producing Chlorpyrifos in a manner which was dangerous to its users;

28

Case ID: 260702772

j.  Negligently formulating Chlorpyrifos in a manner which was dangerous to its users;

k.  Improperly concealing and/or misrepresenting information from scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Chlorpyrifos in order to skew risk-benefit analyses/

101.  Defendants under-reported, underestimated, and downplayed the serious dangers of Chlorpyrifos.

102.  Defendants negligently and deceptively compared the safety risks and/or dangers of Chlorpyrifos with common everyday foods such as caffeine, and other insecticides in advertisements not attached to the product and outside the scope of the EPA-approved label.

103.  Despite the fact that Defendants knew or should have known that Chlorpyrifos causes, or could cause, unreasonably dangerous side effects, Defendants continued to market, manufacture, distribute, and/or sell Chlorpyrifos to consumers, including Plaintiff.

104.  Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

105.  Defendants' violations of law and/or negligence were the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered and/or will continue to suffer.

106.  Defendants' negligence in the design, manufacture, marketing, distribution, and sales of Chlorpyrifos demonstrates a high degree of moral culpability, as it exhibits intentional or deliberate wrongdoing, fraudulent or evil motives, and/or conscious acts that willfully and wantonly disregard the rights of others, including Plaintiff.

107.  As a result of the foregoing acts and omissions, Plaintiff suffered from serious and dangerous side effects including, but not limited to, Parkinson's disease, as well as other severe

Case ID: 260702772

and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.

## COUNT II - STRICT PRODUCTS LIABILITY DESIGN DEFECT
### (ALL DEFENDANTS)

108. Plaintiff incorporates the foregoing paragraphs as if set forth fully herein.

109. At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, sold, and distributed Chlorpyrifos that was used by Plaintiff.

110. Defendants' Chlorpyrifos was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

111. At those times, Chlorpyrifos was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users and, in particular, to Plaintiff.

112. The Chlorpyrifos designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Chlorpyrifos.

113. The Chlorpyrifos designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants' manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

114. At all times herein mentioned, Chlorpyrifos was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially

30

Case ID: 260702772

when used in the form and manner as provided by the Defendants. In particular, Defendants' Chlorpyrifos was defective in the following ways:

a.      When placed in the stream of commerce, Defendants' Chlorpyrifos products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

b.      When inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it has been sprayed or areas near where it has been sprayed, it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause neurodegenerative disease, including Parkinson's disease

c.      When placed in the stream of commerce, Defendants' Chlorpyrifos products were unreasonably dangerous in that they were hazardous and posed a grave risk of Parkinson's disease and other serious illnesses when used in a reasonably anticipated manner.

d.      When placed in the stream of commerce, Defendants' Chlorpyrifos products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

e.      Defendants did not sufficiently test, investigate, or study their Chlorpyrifos products.

f.      Exposure to Chlorpyrifos presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the insecticide.

31

Case ID: 260702772

g.  Defendants knew or should have known at the time of marketing their Chlorpyrifos products that exposure to Chlorpyrifos and could result in Parkinson's disease and other severe illnesses and injuries.

h.  Defendants did not conduct adequate post-marketing surveillance of their Chlorpyrifos products.

i.  Defendants knew, or should have known, that their Chlorpyrifos was in a defective condition.

115.  At the time of Plaintiff's use of and exposure to Chlorpyrifos, the utility of Chlorpyrifos's design did not outweigh the risk inherent in its use in light of Chlorpyrifos's utility to the public as a whole, and its utility to Plaintiff in particular

116.  At the time of Plaintiff's use of and exposure to Chlorpyrifos, Chlorpyrifos was being used for the purposes and in a manner normally intended, as a broad-spectrum insecticide.

117.  Plaintiff reasonably believed that a pesticide sold to be used in areas where humans work and reside would not cause chronic neurotoxic injury to humans.

118.  Based on the dangerous content and properties of Chlorpyrifos, it cannot safely be used in geographic proximity to where humans work or live.

119.  Defendants, with this knowledge, voluntarily designed their Chlorpyrifos with a dangerous condition for use by the public and, in particular, Plaintiff.

120.  Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

121.  Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

Case ID: 260702772

122.    The Chlorpyrifos designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was manufactured defectively in that Chlorpyrifos left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

123.    The Chlorpyrifos designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached its intended users in the same defective and unreasonably dangerous condition in which the Defendants' Chlorpyrifos was manufactured.

124.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to Plaintiff in particular, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

125.    Plaintiffs could not, by the exercise of reasonable care, have discovered Chlorpyrifos' defects herein mentioned or perceived its danger.

126.    By reason of the foregoing, the Defendants have become strictly liable to Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Chlorpyrifos.

127.    Defendants' defective design of Chlorpyrifos amounts to willful, wanton, and/or reckless conduct by Defendants.

128.    Defects in Defendants' Chlorpyrifos were the cause or a substantial factor in causing Plaintiff's injuries.

129.    Defendants' design, manufacture, marketing, distribution, and sales of Chlorpyrifos demonstrates a high degree of moral culpability, as it exhibits intentional or deliberate wrongdoing,

33

Case ID: 260702772

fraudulent or evil motives, and/or conscious acts that willfully and wantonly disregard the rights of others, including Plaintiff.

130.    As a result of the foregoing acts and omission, Plaintiff developed Parkinson's disease, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

**COUNT III-PUBLIC NUISANCE**
**(All Defendants)**

131.    Plaintiff incorporates the foregoing paragraphs as if set forth fully herein.

132.    At all relevant times Defendants designed, manufactured, distributed, and sold Chlorpyrifos for use in the State of California.

133.    Plaintiff was exposed to Chlorpyrifos in the State of California that Defendants designed, manufactured, distributed, and sold.

134.    When Defendants designed, manufactured, distributed, and sold the Chlorpyrifos to which Plaintiff was exposed, it was reasonably foreseeable, and Defendants knew or in the exercise of ordinary case should have known, that when Chlorpyrifos was used in the intended manner or a reasonably foreseeable manner it would be harmful to health in that:

    a.    it was designed, manufactured, and formulated such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

    b.    when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was

34

Case ID: 260702772

likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure.

135.    In so doing, Defendants created a condition that was harmful to Plaintiff's health and to the health of the general public.

136.    Plaintiff did not consent to Defendants' conduct.

137.    All persons living or working near fields or orchards sprayed with Chlorpyrifos designed, manufactured, distributed, and sold by Defendants were and are affected at the same time.

138.    An ordinary person of reasonable sensibilities would be disturbed by the condition created by Defendants' conduct.

139.    The seriousness of the harm—permanent and irreversible neurological damage to persons exposed to Chlorpyrifos—far outweighs the social utility of the product.

140.    Defendants' conduct thus resulted in a public nuisance as defined by Cal. Civ. Code § 3479.

141.    Plaintiff may maintain an action for public nuisance because Plaintiff developed Parkinson's disease as a result of exposure to Chlorpyrifos designed, manufactured, distributed, and sold by Defendants and therefore suffered harm that was different from the type of harm suffered by the general public.

## COUNT IV- BREACH OF IMPLITED WARRANTY OF MERCHANTABILITY
### (All Defendants)

142.    Plaintiff incorporates the foregoing paragraphs as if set forth fully herein.

Case ID: 260702772

143. At all relevant times, Defendants were engaged in the business of designing, manufacturing, distributing, and selling Chlorpyrifos and held themselves out as having special knowledge or skill regarding Chlorpyrifos and other restricted-use pesticides.

144. At all relevant times, Defendants designed, manufactured, distributed, and sold Chlorpyrifos for use in the State of California.

145. Plaintiff was exposed to Chlorpyrifos in the State of California that Defendants designed, manufactured, distributed, and sold.

146. The Chlorpyrifos which injured Plaintiff was not fit for the ordinary purposes for which it was used, and in particular:

a.        it was designed, manufactured and formulated, such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b.        when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

147. As a direct and proximate result of Defendants breach of implied warranty, Plaintiffs suffered the injuries herein described.

## COUNT V — PUNITIVE DAMAGES
### (ALL DEFENDANTS)

148. Plaintiff incorporates the foregoing paragraphs as if set forth fully herein.

36

Case ID: 260702772

149.    Defendants' acts and omissions with regard to Chlorpyrifos constitute willful or wanton negligence or recklessness.

150.    In engaging in the acts and omissions described herein, Defendants acted with a high degree of moral culpability which manifests a conscious disregard of the rights of others.

151.    As a result of the foregoing acts and omission, Plaintiff developed Parkinson's disease, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

## COUNT VI- LOSS OF CONSORTIUM
### (ALL DEFENDANTS)

152.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

153.    At all times since the diagnosis of Parkinson's Disease, Plaintiffs Robert Ranney and Jennifer Ranney were, and are, legally married as husband and wife.

154.    As a direct and proximate result of the aforementioned conduct of the Defendants, and as a result of the injuries and damages to Plaintiffs have been deprived of the love, companionship, comfort, affection, society, solace or moral support, protection, loss of enjoyment of sexual relations, and loss of physical assistance in the operation and maintenance of the home, of their spouses and have thereby sustained, and will continue to sustain damages

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees, punitive damages, and all other relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

Case ID: 260702772

DATED:  July 23, 2026

Respectfully submitted,

**THE MILLER FIRM, LLC**

By: */s/ Tayjes Shah*
Tayjes Shah, Identification No. 307899
THE MILLER FIRM, LLC
The Sherman Building
108 Railroad Avenue
Orange, Virginia 22960
Tel: (540) 672-4224
Fax: (540) 672-3055
E-Mail: tshah@millerfirmllc.com

ATTORNEYS FOR PLAINTIFFS

38

Case ID: 260702772

## VERIFICATION

I, Robert Ranney, hereby state that I am a Plaintiff in this action and I verify that the statements made in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. I understand that the statements therein are made subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsification to authorities.

Dated: 7/23/2026

Robert Ranney
Robert Ranney

39